UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>WARRN N. BARR, III | No. 14 CR 287<br><br>Judge Norgle |

**DEFENDANT WARREN BARR'S REPONSE TO PSR AND POSITION REGARDING SENTENCING**

Defendant, Warren N. Barr, III ("Mr. Barr"), by and through his undersigned, respectfully submits this Response to the PSR and position regarding sentencing:

**I.      Procedural Posture Of The Present Submission**

Mr. Barr has filed with this Court, the following Motions, which are still pending: 1) Motion to Dismiss Indictment and for related relief; 2) Motion to Withdraw Guilty Plea; and 3) Motion to continue sentencing hearing. Based upon those Motions, Mr. Barr and his counsel continue to object to proceeding with the sentencing hearing on January 8, 2019.

To do so, will deny Mr. Barr Due Process and effective assistance of counsel. In addition, based upon the Government's filing of its Sentencing Memorandum with accompanying Exhibits on December 31, 2018, and announcing its intention within that filing to call a witness at the January 8, 2019 sentencing hearing, Mr. Barr and his counsel have not been provided with an adequate opportunity to prepare for that sentencing hearing.

With those objections as a backdrop and subject to them, Mr. Barr submits this Sentencing Memorandum.

## II. Procedural Background To This Action

Mr. Barr adopts the procedural background as set forth in the PSR, as though fully set forth herein.

## III. Mr. Barr's Role/Defendant's Version; Mr. Barr's Objections To "Overview of Case and Roles of Defendants"

The PSR present a set of purported "facts" in paragraphs 11 through 21 (*see* PSR at pp. 6-8) that portray Mr. Barr as not only the alleged architect of the overall mortgage fraud scheme, but the day-to-day perpetrator of it. As set forth below, that is *not* an accurate recitation of the roles of Mr. Barr, his co-Defendants, and the other uncharged individuals who were involved with the Vision on State condominium project (hereinafter "the Vision project").

Here, it is true that, sales on the Vision project were not moving at the pace expected by its investors. However, what changed at that time was that William Sava ("Sava"), who had been spearheading sales efforts on a different project, was moved into a Director of Sales position on the Vision project. Accordingly, Sava took over from the well-known "@properties" (at properties) entity that had been running the sales and marketing efforts for the Vision project.

Sava had also previously enjoyed a successful tenure at the well-known American Invesco real estate entity. Sava brought with him what he claimed to be a sales program that would accelerate sales on the Vision project, which he and others had previously utilized in similar condominium developments.

Sava's new sales program appeared, at least to Mr. Barr, to be relatively straightforward: Sava and his team would bring in buyers for units who would purchase them at *higher* prices than had been previously marketed. Those higher sales prices would be supported by

independent appraisals, and funds would be remitted back to the buyers that were represented to Mr. Barr as legal. Moreover, Sava's team included those who are now charged as Mr. Barr's co-Defendants, Asif Aslam ("Aslam") and Leonardo Sanders ("Sanders"). Sava represented that he had successfully worked with Aslam and Sanders on other prior projects.

However, pursuant to this new sales program to be run by Sava, Aslam, and Sanders for the Vision project, they, the buyers, and other investors in the Vision project - including the Borkowski investors - would gain the direct and indirect benefits of what the PSR calls the "spread" between what had previously been the market prices for the units and the higher prices at which the units would now be sold.

Contrary to the implication in the PSR, Mr. Barr would not and did not receive *any* portion of this "spread." In fact, despite his role in the Vision project, at that time, Mr. Barr was *not* getting paid anything from or for the Vision project. Indeed, his only source of income by that time was from his involvement in a condominium project in Milwaukee, Wisconsin.

This Sava, Aslam, and Sanders driven sales program was given the seal of approval by Mr. Barr's co-Defendants, attorneys Robert Lattas ("Lattas") and Jeffry Budzik ("Budzik") – who claimed it was entirely legal, and importantly who benefitted financially from the scheme. The CFO on the Vison project, Mr. Barr's now co-Defendant, James Carroll ("Carroll"), likewise never indicated to Mr. Barr that there was any issue with this program.[1] In addition, Mr. Barr at all times also believed that, if the units being sold at higher prices were legitimately appraised at those higher numbers by independent, third-party appraisers, that such transactions

---

[1] It is now clear from the Plea Agreements of Carroll and Lattas that they knew back then that these transactions were fraudulent from their inception.

were in fact legitimate and legal. Furthermore, the "spread" was explained to Mr. Barr to be legal and was documented in a sales agreement. This agreement was prepared by Budzig, who was also a close friend of Lattas, Vision's attorney in fact, and counsel to Aslam. He was also known by Sava.

Moreover, it was Carroll who had brought the Borkowski investors to the Vision project so that it could proceed because Mr. Barr was not strong enough financially for that to occur. By the time Sava introduced his sales program, the Borowski investors had final decision-making authority on all material aspects of the Vision project.[2] They had not been experiencing any returns on their investments, and in fact were incurring substantial losses. Their role was to provide financial support for Mr. Barr. Their net worth, in the range of $100 million, was substantial enough to handle the losses and still survive. There was no motive for Mr. Barr to engage in a fraud to reduce those losses. From Mr. Barr's perspective, the Borkowski investors served the role of backstopping any financial issues that incurred, and did not have a reason to pursue any fraudulent activities to mitigate their losses. As a result of this new sales program, the Borkowski investors began to receive funds from the sales of the units at the higher prices in the form of the paydown of their loans arising out of the Vision project, especially their equity loan at Bank of Commerce.

---

[2] Therefore, even though Mr. Barr was in name the Managing Member of the LLC for the Vision project, he could *not* make the material decisions without the approval of the significant Borkowski investors.

As noted in the PSR, Carroll, as CFO on the Vision project, also not only "controlled the finances of Vision on State," he likewise "reconciled the recorded sales price on the HUD-1 settlement statements with the actual sales prices of the units." (*See* PSR at p. 7, paragraph 18)

Furthermore, the PSR states that Mr. Barr, along with Lattas, Aslam, and Sanders "caused to be prepared and submitted to lenders real estate sales contracts for condominium units at Vision on State that they knew contained false and fraudulent information, including inflated sales prices of the units being sold and the identities of the buyers." (*See* PSR at p. 7, paragraph 20, lines 6-9)  That too is not accurate.  Those "false" documents were routinely prepared Mr. Barr's now co-Defendant attorneys, Lattas and Budzik.

Additionally, the PSR inaccurately contends that Mr. Barr himself, among others, "used recruiters to locate straw buyers who would purchase the units." (*See* PSR at p. 7, paragraph 20, lines 6-7)  However, that was *not* the role of Mr. Barr.  That was solely the role of Mr. Barr's now co-Defendants, Aslam and Sanders, pursuant to Sava's sales program.  That is borne out by the Government's 302s in this case.

The PSR also inaccurately asserts that "he [Mr. Barr] . . . used Sanders and Aslam to locate straw buyers to purchase the units at inflated, non-market sales prices." (*See* PSR, at p. 8, paragraph 21, lines 2-3)  For the reasons already detailed above, that is false.

The PSR further inaccurately asserts that "**Barr**, Sanders, and Aslam represented, and caused to be represented, to the straw buyers that 13th and State, LLC would make their down payments and some mortgage payments, pay home owner's association dues, closing costs, and find renters for the condominium units." (*See* PSR at p. 8, paragraph 21, lines 4-7) (emphasis added)  That too is false.  It was Sanders and Aslam, if anyone, who made such representations.

In sum, after reading the PSR's Mr. Barr-centric "Overview of Case and Roles of Defendants," one would think that it was Mr. Barr who literally devised the alleged scheme, and carried out all of its details. As noted above, that is simply not the case.

IV.    <u>**Additional Objections To The PSR**</u>

***The More Than Twelve Million Dollar Loss Amount Was <u>Not</u> Foreseeable To Mr. Barr, And, In Any Event, Is <u>Not</u> Factually Supported By The Preponderance Of The Evidence***

As set forth in the PSR and in Mr. Barr's Plea Agreement, Mr. Barr has pled guilty to a single Count.[3] It is undisputed that the "loss amount," if any associated with that single transaction is approximately $1,700 (one thousand seven hundred dollars).

Nonetheless, the Government asserts that a "loss amount" in excess of $12,000,000 (twelve million dollars) is appropriate. The PRS, without any analysis, essentially blindly accepts the Government's position with respect to that loss amount. This Court should not accept it.

Here, as an initial matter, Mr. Barr's alleged role in the scheme has been detailed above. Accordingly, it was clearly *not* foreseeable to Mr. Barr that the lenders would incur the millions of dollars in alleged losses that the Government and the PSR claims they suffered. For that reason alone, this Court should reject the Government's position with respect to the loss amount, and instead find that the loss amount is less than two thousand dollars ($1,700).

In addition, even apart from that issue, this Court should still decline to enhance the loss amount as urged by the PSR and the Government. Here, apart from attaching a chart that purports to show the alleged loss amount with respect to various units, the Government has failed

---

[3] As noted above, Mr. Barr seeks to withdraw that plea of guilty.

to provide (and, in turn, the PSR has failed to provide) a factual basis specifically linking Mr. Barr to those transactions, or, perhaps more importantly, providing a factual basis that identifies the acts of Mr. Barr's alleged "co-schemers" with respect to those transactions. For that additional reason, this Court should reject the Government's position with respect to the loss amount, and instead find that the loss amount is less than two thousand dollars ($1,700). *See, e.g., United States v. Titus*, 823 F.3d 930 (7th Cir. 2016).

### *Even If This Court Were To Accept The PSR's And The Government's Version Of The Loss Amount, That Loss Amount Substantially Overstates The Offense Level*

As set forth in the PSR, if the loss amount urged therein is accepted by this Court, it astronomically, and inappropriately, result in a gross overstatement of the Offense Level, i.e., taking it from a base Offense Level of 7 and increasing it twenty (20) levels to a 27. Accordingly, that increase in the Offense Level results in a gargantuan increase in the suggested Guidelines range applicable to Mr. Barr. Since such an increase results in an over-statement of the seriousness of the Offense, this Court should decline to impose a sentence that bears any relationship to an Offense Level of 27.

### *Mr. Barr Was Not A Manager/Supervisor, And There Is No Basis For Enhancing His Guidelines Range On That Basis*

The PSR and the Government contend that a three-level increase to the Offense Level is warranted because Mr. Barr was purportedly a "manager or supervisor" to the alleged criminal activity. As set forth above (*see* "Defendant's Version" above), there is absolutely no basis for such a finding. Moreover, the only basis offered by the PSR for this enhancement is its claim that Mr. Barr allegedly "recruited Lattas [co-Defendant] to represent 13th and State, LLC at closings for the sale of numerous condominium units at Vision on State and he recruited Sanders

and Aslam to seek out straw buyers to fraudulently purchase condominium units." (*See* PSR at p. 11, paragraph 43, lines 2-6)

Both of those contentions are entirely baseless. Mr. Barr did <u>not</u> recruit Lattas into the alleged scheme. It is undisputed that Lattas had been the attorney for the Vision project long *before* Sava introduced his new sales program. Similarly, it is undisputed that Mr. Barr did <u>not</u> recruit either Sanders or Aslam into the alleged scheme. Both Sanders and Aslam had preexisting relationships with *Sava*. It is undisputed that Mr. Barr did not even know who Sanders and Aslam were prior to Sava bringing them into the fold as part of his new sales program.

Based upon all of the foregoing, there is no legitimate basis for finding that Mr. Barr was a manager or supervisor and tagging with a three-level increase because of his alleged position with respect to the occurrences at issue. The evidence actually supports the fact that Mr. Barr was not a manager or supervisor.

### *The "Sophisticated Means" Enhancement Is Not Warranted Under The Facts Presented*

The PSR suggests that a 2-level increase to the offense level is appropriate because Mr. Barr's conduct purportedly involved "sophisticated means" within the meaning of U.S.S.G. § 2B1.1(b)(10). A defendant's scheme should only be found to have employed "sophisticated means" if it involved "**especially complex or especially intricate** offense conduct pertaining to the execution or concealment of an offense." *See United States v. Harris*, 791 F.3d 772 (emphasis added) (*citing* U.S.S.G. §2B1.1(b), cmt. n.8(B) (2010)). Such an enhancement is warranted only where the "defendant's offense, viewed as a whole, shows a greater level of planning or concealment **than typical fraud of its kind**." *Id.* (emphasis added) (citations omitted); *see also United States v. Harris*, 718 F.3d 698 (7th Cir. 2013) (must be more than

"typical fraud"). Thus, the defendant's conduct must be "**notably more intricate** than that of the garden-variety offense." *United States v. Knox,* 624 F.3d 865, 871 (7th Cir. 2010) (emphasis added).

Furthermore, where, as here, the allegedly "relevant conduct" of others is apparently being used as the basis for the sophisticated means enhancement as to Mr. Barr, that conduct of others must be "forseeable" to the defendant at issue – here, Mr. Barr. *See, e.g., United States v. Anobah*, 734 F.3d 733, 738-739 (7th Cir. 2013)

Applying those standards to the present case leads inescapably to the conclusion that the suggested "sophisticated means" enhancement is not appropriate based upon the facts underlying Mr. Barr's conduct. In short, there was nothing particularly complex or intricate about the "scheme" allegedly employed by Mr. Barr. Here, like in virtually every financial fraud case, Mr. Barr purportedly signed a document that contained several false statements. Moreover, that document, in and of itself, was not complex or intricate. Instead, the documentary trail created by Mr. Barr, like those created in virtually every financial fraud case, represented an attempt to demonstrate that certain facts about him were something that they were not. Thus, in every respect, Mr. Barr's "scheme" and course of conduct in this case mirrored that present in virtually every other "garden variety" financial fraud case. In addition, the allegedly "sophisticated means" purportedly employed by others who were part of the alleged scheme were not foreseeable to Mr. Barr for the reasons already detailed above. Accordingly, a 2-level increase to the offense level is not warranted, and would be wholly inappropriate.

### *There Should Be No Increase For Mr. Barr's Alleged Receipt Of Monies – Purportedly In The Amount Of One Million Dollars ($1,000,000)*

The PSR's position with respect to a purported two-level enhancement for Mr. Barr's alleged receipt of proceeds is simply incredible. The PSR first states, "**[T]he undersigned has no specific information as to the amount of money the defendant derived from this scheme.**" (*See* PSR at p. 11, paragraph 40, lines 4-6) (emphasis added) The PSR should more accurately read that the undersigned has **no** information that Mr. Barr received any money at all derived from this scheme.

Be that as it may, the PSR then nonetheless concludes that, "[h]owever, based on the total loss amount, the fact that defendant was the chief executive officer of 13th and State, LLC, and the owner/developer of Vision, **there is sufficient evidence to suggest that based on a preponderance of evidence standard, the defendant derived more than $1,000,000 in gross receipts as a result of the instant offense.**" (*Id.* at lines 5-9) (emphasis added) The PSR seemingly believes that a preponderance of evidence standard equates with rank speculation. There is no evidentiary basis to assume, infer, or conclude that Mr. Barr received one penny, let alone $1,000,000, in gross receipts from the scheme. Accordingly, this Court should refuse to make this 2-level enhancement to the Offense Level. In fact, Mr. Barr's compensation from the Vision project stopped far in advance of the fraud alleged in this case, and his only source of income was from another project.

### *Mr. Barr Has Appropriately And Fully Accepted Responsibility*

The PSR attempts to take the position that Mr. Barr should *not* get credit for acceptance of responsibility. That too would be error. Because Mr. Barr is raising legal challenges to the PSR, to his Plea Agreement, and submitted comments to the PSR (which the PRS merely

summarized and did not attach to the PSR) regarding Counts that he did <u>not</u> even plead guilty to, is no basis at all to deny him acceptance of responsibility. Indeed, to the extent that his plea stands, and he is not allowed to withdraw it, he has accepted responsibility by way of that plea.

V. **Additional Argument/Position Regarding Sentencing**

*18 U.S.C. §3553(a) Sentencing Factors*

As this Court well knows, Title 18 Section 3553(a) requires it to impose a sentence that is "sufficient but not greater than necessary," to comply with the purposes of sentencing. *See* 18 U.S.C. §3553(a)(1)-(7).

In addition to the non-binding Guidelines, this Court is of course also required to "thoughtfully consider" the 3353 factors. *See, e.g., United States v. Adams*, 746 F.3d 734, 748 (7th Cir. 2014). Pursuant to 18 U.S.C., § 3553, a District Court is required to "*impose a sentence sufficient, but not greater than necessary*," taking into account -- among other things -- the following:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed-- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; . . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty.

(7) the need to provide restitution to any victims of the offense.

*Id.* at 18 U.S.C., § 3553 (emphasis added).

However, "sentencing is never abstract: **the district court is required by statute to tailor its sentence to the particular defendant before it**." *United States v. Solomon*, 892 F.3d 273, 279 (7th Cir. 2018) (emphasis added). Moreover, although District Courts are required to properly ascertain the applicable Guidelines range, "they enjoy the discretion, in appropriate cases, to disagree with the views of the Sentencing Commission in deciding what the ultimate sentence ought to be under the overarching sentencing statute." *United States v. Moreno*, 870 F.3d 643, 649 (7th Cir. 2017).

Here, as set forth below, the application of the 3553 factors to Mr. Barr in this case militates against the imposition of a sentence within the suggested Guidelines, or of the type urged by the Government. Instead, if this Court is to impose a period of incarceration at all, it should be for a period *far less* than 28 months (*see* below with respect to that 28-month marker). To send Mr. Barr off for a lengthy period of incarceration will serve no legitimate purpose.

### *The History and Characteristics of Mr. Barr*

There are many facts regarding Mr. Barr that are clearly germane to any legitimate assessment of his life trajectory and how he ended up before this Court.

For the **sixty (60)** or so years of Mr. Barr's life, he was not involved in any criminal activities of any significance whatsoever.

During the past **five (5)** years while this case has been pending, Mr. Barr has likewise not been involved in any criminal activities of any kind at all.

Moreover, Mr. Barr had at all times prior to the matters at issues, enjoyed successful gainful employment. Since the matters at issue began, Mr. Barr has struggled to regain his professional footing, but he has at all times attempted to be gainfully employed.

In short, Mr. Barr has lead a productive professional and family life for decades, and there is every reason to believe that he will continue to do so once this case is concluded.

For that reason alone, the imposition of a sentence of the type of duration suggested by the PSR and urged by the Government is entirely nonsensical. Any sentence requiring a significant period of incarceration, or any period of incarceration at all (*see* below) would be far greater than necessary to achieve any legitimate aims of sentencing, and would completely discount and ignore the type of life and the type of person that Mr. Barr has been for decades and continues to be.

### *The Need For The Sentence To Reflect The Seriousness Of The Offense, Respect For The Law, And To Provide A Just Punishment For The Offense*

Mr. Barr of course recognizes that this Court must attempt to fashion a sentence that appropriately reflects the "seriousness of the offense" and/or "respect for the law," while simultaneously providing a "just" punishment. However, that sentence must be "sufficient, but not greater than necessary."

When viewed against the other types of federal offenses commonly prosecuted in this building - including other "white collar" financial crimes of this type - and the complete circumstances regarding Mr. Barr and his role in this offense - a sentence that is far below the Guidelines range suggested in this case seems particularly appropriate and reasonable; including one that would involve *no period of incarceration* (or some other form of it, including home confinement).

Indeed, putting Mr. Barr in the BOP for the lengthy time period suggested by the Guidelines, the PSR, or the Government will *not* serve to promote any greater "respect for the law." Therefore, a "just" sentence is one that is far lower than that suggested by the Guidelines range, the Government, and the PSR in this case – and including no period of incarceration at all. To the extent a period of incarceration is deemed necessary at all, it should be one that is *far less* than twenty-eight months (*see* below with respect to that 28-month marker).

### *The Need For The Sentence To Provide Deterrence*

The 3553 factors take into account two of the age-old aims of sentencing: specifically deterring an individual from engaging in further criminal activity and generally deterring others from engaging in that same activity in the future. Here, this is simply not a case that, from a publicity or public awareness standpoint, will have any impact upon any other offender or potential offender such that "general" deterrence will be furthered by anything approaching a Guidelines type sentence. For anyone, including the Government, to claim otherwise is nothing more than unsubstantiated speculation that has no empirical foundation.

With respect to "specific" deterrence, Mr. Barr has already clearly been specifically deterred. This has been a life-changing event for Mr. Barr. Thus, a Guidelines type sentence would clearly be "**greater** than necessary" to accomplish any legitimate sentencing aim of deterrence. Again, to the extent a period of incarceration is deemed necessary at all, it should be one that is *far less* than twenty-eight months (*see* below).

### *The Need To Protect The Public*

Mr. Barr has never been a threat to anyone, and it is a sure bet that he will never be one in light of his life to-date.

If this Court has any concerns at all about Mr. Barr in terms a threat to any party's finances, that can be fully and adequately addressed by the terms of his Supervised Release.

### *The Need To Avoid Sentencing Disparities*

Two of Mr. Barr's co-Defendants have already been sentenced in this matter. With respect to co-Defendant, Lattas (an attorney), this Court imposed a sentence of sixty-three (63) months. *See* Docket at No. 281. With respect to co-Defendant Sanders, this Court imposed a sentence of twenty-eight (28) months. *See* Docket at No. 229.

Based upon the facts presented, including the alleged role of Mr. Barr with respect to the overall scheme, it is impossible to see how Mr. Barr could be facing a *greater* sentence than even Sanders, much less Lattas. Each of those co-Defendants had far greater involvement in, and culpability for, the occurrences at issue than Mr. Barr. It is not even a close case. Thus, to avoid wholly arbitrary sentences and sentencing disparities, this Court should sentence to Mr. Barr to a period of confinement - if it finds that Mr. Barr should be confined at all – that is far *less* than the sentence than the 28-month sentence that has been imposed upon his co-Defendant Sanders. Of course, such a sentence would then also be one that is far less than the one this Court imposed upon co-Defendant Lattas.

### *Additional 3553 Factors: Mr. Barr Was Already Confined For An Extensive Period Of Time, And In Horrible Conditions, As A Direct Result Of The Present Case*

As this Court well knows from Mr. Barr's prior submissions to this Court, as a direct result of this case, Mr. Barr was jailed in Saudi Arabia. *See* Barr Affidavit, previously submitted in support of his March 21, 2017 Brady Motion. He was then held for six (6) months. *Id.* During those six months, he was forced to endure squalid conditions. Moreover, he had no idea how long he was going to be detained. Mr. Barr's contact with the outside world was next to

nothing. Of course, he did not have and could not have any visitors, ever, apart from certain meetings with officials for the Government.

The extent of the United States' involvement in that confinement is still unknown. *See* Mr. Barr's Motion to Dismiss Indictment, and his Reply in support of that Motion.

That incarceration caused tremendous emotional distress to Mr. Barr. That incarceration continues to do so, and continues to haunt him. As a result, he has been more than punished enough. No additional period of incarceration is necessary or appropriate in light of that other incarceration. In sum, any additional period of incarceration would be "greater than necessary" to achieve any legitimate aims of sentencing.

### *Additional 3553 Factors: Recidivism*

In light of Mr. Barr's age, it is <u>extraordinary</u> unlikely that he will ever commit additional offenses. *See* USSC, *A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score* 1, 8 & n.29 (2005).[4] This is particularly true where, as here, he has been and is fully and gainfully employed in a responsible position, and had no prior involvement with law enforcement of any significance. That is yet another reason why any period of incarceration – if found to be appropriate at all – should be entirely insubstantial, and of course *far less* than the 28-month sentence imposed upon Mr. Barr's co-Defendant Sanders.

---

[4] *See also* http://ww.ussc.gov/Research/Research Publications/Recidivism/20050114 Recidivism Salient Factor Computation.pdf.

*Additional 3553 Factors: The Cost Of Federal Confinement*

Put simply, it would be a gross misuse of public resources to pay the additional tens of thousands of dollars that would arise out of the incarceration of Mr. Barr. This is particularly true at a time where the prison populations are burgeoning and the Courts are increasingly realizing that incarceration solves nothing. Accordingly, again, any period of incarceration – if found to be appropriate at all – should be entirely insubstantial, and of course *far less* than the 28- month sentence imposed upon Mr. Barr's co-Defendant Sanders.

V. **Defendant's Position With Respect To The Proposed Terms Of Supervised Release**

**Mandatory Conditions:** No objections.

**Discretionary Conditions:** Limited objections, as noted below.

**No. 5:** In light of all of the other conditions being placed upon Mr. Barr, he should not be barred from engaging in the real estate development. There are more than enough other adequate safeguards in place to monitor his conduct, even if he were to participate in this industry.

**No. 16:** Objection only in part to this condition. In light of the fact that US Probation can visit Mr. Barr virtually anywhere and at any time, he should not be visited at work. Such visits could imperil his employment and is unnecessary.

**No. 18:** Objection only in part to this condition. It should not include reporting in response to minor traffic stops.

**Special Conditions:**

**No. 3:** Objection only in part to this condition. The community service requirement, if and when it kicks in, should be limited to 10 hours per week in order to maintain the focus on obtaining gainful employment.

**WHERFORE**, Mr. Barr, by and through his undersigned counsel, respectfully requests the entry of an Order providing a sentence consistent with all of the above, and for such other and further relief as is appropriate.

                      **RESPECTFULLY SUBMITTED,**

                      By:/s/Michael I. Leonard
                            **Counsel for Mr. Barr**

**LEONARDMEYER, LLP**
Michael I. Leonard
120 North LaSalle, 20th Floor
Chicago, Illinois 60602
(312)380-6559 (direct)
(312)264-0671 (fax)
mleonard@leonardmeyerllp.com

## CERTIFICATE OF SERVICE

      The undersigned states that, on January 7, 2019, he caused the above document to be served upon opposing counsel of record by ECF filing.

                      **RESPECTFULLY SUBMITTED,**

                      By:/s/Michael I. Leonard
                            **Counsel for Mr. Barr**